1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TRESSA J. MORRISON,

11          Petitioner,                    2: 08 - cv - 3032 - MCE TJB

12   vs.

13   DEBORAH L. PATRICK,

14          Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16                  I.  INTRODUCTION

17          Petitioner, Tressa J. Morrison, is a state prisoner proceeding with a counseled petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of

19   seventy-five years to life imprisonment plus eleven years and eight months following a jury trial

20   for which she was convicted of several crimes including murder, attempted murder and assault

21   with a firearm.  The jury also found true several specific allegations including that the murder

22   and attempted murder were committed willfully, deliberately and with premeditation, intentional

23   and personal discharge of a firearm and that Petitioner personally used a firearm during the

24   commission of her crimes.  Petitioner presents three claims in her amended federal habeas

25   petition; specifically: (1) Petitioner's trial counsel was ineffective when he failed to thoroughly

26   investigate and evaluate available evidence of Petitioner's psychosis and failed to make the

1

1   proper objections to preserve Petitioner's rights ("Claim I"); (2) prosecutorial misconduct when

2   he questioned mental health experts about Petitioner's state of mind at the time of the shooting

3   ("Claim II"); and (3) trial court error by the use of a jury instruction that wrongly increased the

4   burden of proof on Petitioner to prove to a certainty that the circumstantial evidence would

5   support only a finding of insanity ("Claim III").  For the following reasons, Petitioner's habeas

6   petition should be denied.

7                                       II.  FACTUAL BACKGROUND[1]

8   The events underlying this tragedy occurred at the Loma Vista
    Apartment complex in Redding, California.  On November 3,
9   2003, Rochelle Coccellato, who was living in apartment 27, went
    to her neighbor's apartment to borrow a vacuum cleaner.  When
10  the neighbor, Dana DePonte, opened the door, Coccellato gave her
    a "really awkward strange look."  When DePonte asked what was
11  wrong, Coccellato rolled her eyes to the right.  DePonte looked out
    of the doorway and saw defendant, who lived in apartment 28,
12  sitting so that she was facing them and drinking from a coffee cup.
    Coccellato went into DePonte's apartment for about two minutes,
13  then left.  Immediately after DePonte locked the door she heard a
    gunshot, Coccellato's scream, and more gunshots.
14
    Daniel Hawley was visiting his friend Anthony Hackler.  Hackler
15  lived in apartment 27 with his mother, his two younger brothers,
    and his girlfriend, Coccellato.  They were in the living room of
16  apartment 27 when they heard two pops that sounded like
    fireworks.  Hackler ran to the door, opened it, and yelled that his
17  girlfriend had been shot.  He ran outside, there were two more
    shots, and Hawley saw Hackler fall.  When Hackler was hit, he was
18  running away from apartment 28, defendant's apartment.  Hawley
    crawled out to Hackler.  Hackler said, "[t]he neighbor shot me."
19  Hackler also told Hawley his girlfriend had been shot.  He asked
    Hawley to go to her.
20
    Hawley could see Coccellato lying partially on the sidewalk and
21  partially in the parking lot.  He went to her, and could see that she
    had been shot in the head.  As he was trying to help her, he heard a
22  screen door open, and looked up to see if someone was coming to
    help.  Instead, he saw defendant holding a gun.  He heard three or
23  four more shots, and saw defendant pointing the gun in his
    direction.  Hawley felt a bullet zip past his hair.  He ducked behind

24

25  ────────────────────
        [1] The factual background is taken from the California Court of Appeal, Third Appellate
26  District opinion dated February 8, 2008 and filed with this court by Respondent on December 10,
    2009 as Lodged Document 3 (hereinafter the "Slip Op.").

                                                    2

a car in the parking lot.  After the shooting stopped, he heard the screen door open and shut again.  He peeked out and did not see defendant.

Another man, Anthony Duran, came and helped Hawley drag Coccellato out of the line of fire.  While that man stayed with Coccellato, Hawley went back to Hackler and dragged him between two vehicles in the parking lot.  He stayed with Hackler until Hackler died, and was still with him when the police arrived.  Duran testified that while he was with Coccellato and Hawley, he saw the shooter walk up.  She said something like, "You killed my son or grandson . . . ."  She pointed the gun at them, and they moved out of the way.  He heard the gun fire, and felt he would have been shot if he had not taken cover.  When defendant went back into her apartment, he went back over to help Coccellato, then he heard the sirens.

Gina Gilmer lived in apartment 30.  She went outside on her upstairs balcony when she heard gunshots.  Below her she saw a young man stumbling saying, "I've been shot," and "she shot my girlfriend."  Afterward, she went back out and saw a girl lying at the bottom of the stairs with her face blown off.  A man was with her, so Gilmer went back to the boy.  As she was holding his hand, she looked up and saw defendant pointing a gun at her and screaming something about her son.  Gilmer moved backwards between two cars.  She would have been shot if she had not moved.

Paul Stearns lived close to the Loma Vista Apartments.  He heard gunshots and went to investigate.  He saw a man lying on the ground and a girl pulling on his arm.  Then he saw defendant come out of the apartment with a gun in her hand and say, "Kill my son, will you."  She then fired three more shots.

Ray Butts was the apartment manager at Loma Vista Apartments.  He ran to his window when he heard the first gunshot and saw Coccellato lying on her right side, her arm going back and forth.  He then saw Hackler come running out the door of apartment 27.  He saw Hackler get shot in the back as he was running towards Coccellato.  Hackler fell to the ground and said something like, "I think I've been hit."  Butts saw the hand and arm of the person doing the shooting coming out of apartment 28, defendant's apartment.  Butts saw Duran run over to Coccellato, then heard another gunshot.  The person with the gun went back into apartment 28.  As defendant was being led to the police car after the shooting she said to Butts, "I told you if you didn't take care of this, I was going to shoot the little motherfuckers."

Hackler was pronounced dead at the scene of the shooting.  He had been shot in the middle of his back.  Coccellato was taken to the hospital.  She had multiple gunshot wounds to the head, chest, and right arm.  Initially, the doctors treating her did not believe she

would survive due to the extent of her injuries.  She was in a coma for several days.  She is permanently disabled, suffering from weakness to her left side, decreased vision in her right eye, loss of hearing, and cognitive difficulties.

About two months before the shootings, defendant's 16-year-old grandson, Chance, died of an accidental overdose of Methadone. Kevin Kimple from the Redding Police Department investigated Chance's death.  Chance was found in apartment 10 at the Loma Vista complex, which belonged to Elray Pond.  Chance had taken the drugs at a different location and had been carried to apartment 10 and left on the couch.  When the ambulance arrived, he was blue.

Defendant told investigator Kimple that Anthony Purdom was a possible suspect in her grandson's death.  Defendant called Kimple regarding the investigation into her grandson's death about half a dozen times prior to the shooting.  She was anxious for some resolution and was distraught over some events that had been occurring at the apartment complex.  She appeared to become more impatient and frustrated as the calls progressed.

Kimple finally located Purdom about two and a half weeks after the shooting incident.  Purdom, who was 15 years old, was arrested, charged, and found responsible in juvenile court for providing narcotics to Chance.  Purdom was not charged with murder because there was no indication that Chance took the drugs involuntarily.

Defendant blamed the people in apartment 27 for Chance's death. The kids in apartment 27 had come over after Chance's death, pointed to a bottle of aspirin, and said, "This looks like the same stuff we gave Chance."

Defendant was afraid of the people from apartment 27, and told friends they were harassing her.  She was afraid to go outside her apartment.  Once, someone from apartment 27 came out and cocked a gun at defendant.  When she would leave her apartment, Heckler would say things to her like, "You better get back in your house, bitch," or "Why are you coming out here, bitch?"

Witnesses recounted numerous instances of the young people in apartment 27 threatening and harassing defendant.  They threatened defendant's daughter when she would visit her mother, and told her they did not want her there, either.  Once after Chance died, defendant was singing along with one of Chance's tapes. One of the neighbors yelled out, "Chance, tell your mom to shut the fuck up."  Another time someone from apartment 27 called out, "Mom, it's me, Chance.  It's dark here . . . ."  They also threw food on defendant's truck.

4

Butts testified that Coccellato had verbally harassed defendant, calling her a bitch. Hackler, too, had harassed defendant. Butts testified defendant was verbally harassed any time she came within speaking distance of the people in apartment 27. She told him she was scared for her life just to go to the laundromat. Defendant had gone to Butts numerous times and asked to be released from her apartment lease. He went to his management and explained to them that defendant was being harassed by other people in the apartment complex, but he never got permission to let her out of her lease.

After the shooting, the police searched defendant's apartment pursuant to a search warrant. There were two firearms in the apartment – a handgun and a .22 rifle. There were three expended casings in the cylinder of the handgun, indicating it had been fired three times with the bullets that were in the cylinder. There were another six expended casings on the stove in the kitchen, indicating defendant had fired six shots, then reloaded the gun in the kitchen.

Also in the apartment was a typewritten letter dated approximately two weeks before the shootings. The letter stated in part, "I would like to request that my grave not be marked for at least a period of two years allowing time for friends of those I killed to pass and therefore lessening the chances of any grave desecration." Another letter, said, "I want to kill." Yet another said, "I would rather be dead than to let them live."

Police discovered a portable video camera in defendant's apartment that contained a videotape entitled, "My Neighbor's Fate." The video is date stamped November 2, 2003, the day before the shootings. The camera was still running when the officers entered the apartment. The tape was admitted into evidence and played for the jury.

On the videotape, defendant mourns her grandson, complains about the neighbors, and protests that no one went to jail for killing Chance. She says, "Believe me if I had time I'd go kill all the fucking parents for raising off-the-wall people. They need to be dead. Their off-spring need to be dead. They all need to be dead, dead, dead, dead. You know how they party on. They just party on next door." She tells the camera, "I want to shoot her with the bottle of aspirin in her fucking mouth, so her Daddy will see . . . ."

The videotape shows a telephone conversation in which defendant tells the caller that "they" had hours to call 911, but did not because they "wanted to save their little druggie asses . . . ." Toward the end of defendant's appearance on the tape, apparently right before the shootings, she says to the camera while showing a handgun, "See what I have . . . . They got a 9 millimeter, I've tried to tell you that. Thought I'd get me something. Wait'll they get a load of this. Or get a few loads of it. I'm waiting on 'em to come

home." Then, "Any time now.  They're not gone long when they make drug deals . . . ."

Just before a break in the tape, defendant holds an aspirin bottle up to the camera and says, "This is aspirin, this [showing her gun] is Methadone, this is Ecstasy, this is drinking somebody's piss." [FN 1]  At this point there is a break in the tape during which time defendant apparently committed the shootings.  Afterward she tells the camera, "Fool me once, shame on you.  Fool me twice, shame on me.  All the managers here knew there were drugs, nobody does anything about it.  They killed my son, oh my God.  All I asked for was justice!"
[FN 1] Earlier in the tape defendant tells someone on the phone, "You know fucking well they made him drink their fucking piss . . . . Oh-h, make my son drink their piss."

At this point in the tape defendant begins to get several telephone calls.  She tells one caller she needs to call someone very important to her before she will give herself up.  She tells another caller named Steve that she "just killed some people."

(Slip Op. at p. 4-11.)

## III.  PROCEDURAL HISTORY

### A.  State Court Proceedings

Petitioner pleaded not guilty and not guilty by reason of insanity.  Petitioner was found guilty of first degree murder of Heckler, attempted murder of Coccellato and three counts of assault with a firearm against Duran, Gilmer and Hawley.  The jury also found as true all of the special circumstances allegations which included causing death or great bodily injury and using a firearm.  After this verdict, a separate sanity trial was conducted.  The first sanity trial resulted in a deadlocked jury and the court declared a mistrial as to the sanity phase only.  A second sanity trial resulted in the jury finding Petitioner legally sane during the commission of the crimes.

Petitioner appealed her convictions to the California Court of Appeal, Third Appellate District.  Among the claims that Petitioner raised in her direct appeal were Claims II and III of Petitioner's amended federal habeas petition.  That court affirmed the judgment on February 8, 2008.  Petitioner then filed a petition for review in the California Supreme Court.  Again she raised several claims, including her arguments as set out in Claims II and III of the instant federal

6

1  habeas petition.  The California Supreme Court summarily denied the petition for review on May

2  21, 2008.

3      On April 15, 2008, Petitioner filed a state habeas petition with the California Supreme

4  Court.  Petitioner raised one claim in that state habeas petition; specifically Petitioner argued that

5  trial counsel was ineffective by failing to obtain an expert to assist with the guilty and sanity

6  trials.  On September 17, 2008, the California Supreme Court denied that state habeas petition.

7      B.  Federal Court Proceedings

8      In December 2008, Petitioner filed a *pro se* federal habeas petition in this court.

9  Petitioner raised the following claims in that original federal habeas petition:  (1) ineffective

10  assistance of counsel for failing to obtain an expert to assist with the guilt and sanity trials; (2)

11  Petitioner was "denied a fair trial and the assistance of counsel because confidential fee requests

12  were made available to the DA's office by the county computer system" (Dkt. No. 1 at p. 4.); and

13  (3) Petitioner was "denied a fair trial by jury because one juror contacted the court after [her]

14  appeal and [her] attorney was not informed of what occurred."  (Id. at p. 5.)

15      On January 8, 2009, Magistrate Judge Hollows appointed the Federal Defender to

16  represent Petitioner.  On January 20, 2009, Marylou Hillberg was substituted as counsel in place

17  of the Federal Defender.  On February 24, 2009, Petitioner was given 180 days to file an

18  amended federal habeas petition.  On August 21, 2009, Petitioner sought an extension of time to

19  file an amended habeas petition which was granted.  Subsequently, Petitioner sought a second

20  extension of time to file an amended habeas petition which was granted by Magistrate Judge

21  Hollows on September 17, 2009.

22      On October 9, 2009, Petitioner filed a motion to file late amended habeas petition as

23  Petitioner had only been granted an extension of time to file an amended habeas petition until

24  September 30, 2009 by Magistrate Judge Hollows.  Petitioner's habeas counsel declared that,

25  "[t]here was a habeas seminar put on by the Office of the Federal Defender a week ago on

26  October 2, 2009.  Due to some recent losses in this court, I decided that I should first attend that

7

1  seminar before I finalized this petition and settle some questions that I pondered.  I have since

2  rewritten portions of this petition." (Dkt. No. 20 at p. 2.)  Petitioner also filed an amended

3  federal habeas petition on October 9, 2009.  Magistrate Judge Hollows granted this request to file

4  the late amended habeas petition on October 21, 2009.

5        Petitioner raised the following claims in that first amended habeas petition:  (1) Petitioner

6  was deprived of her Sixth Amendment right to effective assistance of counsel at trial who failed

7  to thoroughly investigate and evaluate available evidence of Ms. Morrison's psychosis, failed to

8  research or consult with any outside expert on the evidence that was uncovered, failed to

9  investigate or retain another expert on the results of the blood test of Ms. Morrison which

10  reported less than 10 nanograms per milliliter of methamphetamine in her blood, and failed to

11  make the proper objections to preserve petitioner's rights; (2) denial of due process and a fair

12  trial in violation of the Fourteenth Amendment by numerous instances of misconduct by the

13  prosecutor which so infected the trial with unfairness as to make the resulting conviction a denial

14  of due process, including (a) improper questioning by the prosecution as to the ultimate question

15  as to Petitioner's state of mind at the time of the shooting; and (b) interference with attorney

16  client confidentiality because the prosecution had access to confidential billing records of trial

17  counsel and his investigator over Shasta County's computer system that allowed them to track

18  what work was being performed to prepare for trial; and (3) denial of due process and a fair trial

19  when the trial court used a jury instruction that wrongly increased the burden of proof on

20  Petitioner to prove to a certainty that the circumstantial evidence would support only a finding of

21  insanity.

22        Respondent answered the amended federal habeas petition on December 8, 2009.  In her

23  answer, Respondent argued that Claim III and portions of Claims I and II were barred by

24  AEDPA's one-year statute of limitations because they did not relate back to the original federal

25  habeas petition that Petitioner filed *pro se* in December 2008.  Notwithstanding this argument,

26  Respondent also argued that Petitioner was not entitled to federal habeas relief on the claims

1    raised in the amended federal habeas petition on the merits.

2         Petitioner filed her traverse on June 28, 2010.  In that traverse, Petitioner withdrew her

3    argument in Claim II that the prosecution had committed misconduct through unauthorized

4    access to confidential defense billing information.  Additionally, Petitioner admitted that "much

5    of claim one remains unexhausted in the state courts." (Pet'r's Traverse at p. 2.)  Petitioner

6    stated that once she had finished her investigation into these claims, she intended to exhaust them

7    in state court and file a motion for stay and abeyance in this Court.  (See id. at p. 3.)  Petitioner

8    also admitted that Claim III and the remaining portion of Claim II did not relate back to the

9    initially filed federal habeas petition in December 2008.  Petitioner argued that these Claims

10   should be considered timely based on an equitable tolling theory.

11        On November 20, 2010, Petitioner filed a "status report" where she stated that, "[t]he

12   factual investigation generously permitted by this Court on the new claims has been completed.

13   There are no additional facts to present to this Court.  No further factual development is

14   requested at this time.  Petitioner . . . request[s] that the petition be deemed submitted pending

15   further order of this Court."[2]  (Dkt. No. 39 at p. 1.)

16        On January 4, 2011, Petitioner was ordered to either file a motion to stay and abey the

17   proceedings or inform the court that she was declining to file a motion to stay and abey the

18   proceedings, in which case the unexhausted claims in the amended federal habeas petition would

19   be deemed stricken.  This order was filed in light of Petitioner's admission in her traverse that

20   several of her arguments in the amended federal habeas petition were unexhausted.

21        On January 19, 2011, Petitioner filed another "status report."  In that status report,

22   Petitioner stated that "that there will be no Rhines Motion filed to stay and abey as there are no

23   claims to be brought that have not already been fully exhausted in the state courts." (Dkt. No. 42

24   at p. 1.)  This January 19, 2011 status report was unclear as to whether Petitioner had now

25

26        [2] On that same day, November 22, 2010, Chief Judge Ishii transferred this matter from
     Magistrate Judge Hollows to the undersigned.

9

1   exhausted her previously unexhausted arguments in the amended federal habeas petition.

2   Therefore, another order was issued on February 2, 2011 which ordered Petitioner to either:  (1)

3   produce proof that the previously unexhausted claims were now exhausted through state court

4   filings and opinions/orders; (2) file a motion to stay and abey these federal habeas proceedings to

5   allow Petitioner to exhaust her unexhausted claims; (3) inform this Court that Petitioner only

6   wanted to proceed on her exhausted claims; or (4) proceed on the instant amended federal habeas

7   petition as is.  (See Dkt. No. at p. 3-4.)

8          On February 22, 2011, Petitioner filed a statement narrowing her federal habeas claims.

9   Petitioner narrowed Claim I so that the only ineffective assistance of counsel claim that she is

10   now bringing is that trial counsel was ineffective for failing to thoroughly investigate and

11   evaluate available evidence of Petitioner's psychosis and failing to make proper objections to

12   preserve Petitioner's rights.  Claim II was narrowed such that Petitioner now only argues that the

13   prosecutor committed misconduct through improper questioning of Petitioner's state of mind at

14   the time of the shooting.  Petitioner had previously narrowed this Claim in her traverse.  Claim III

15   remained as pled in the amended federal habeas petition.

16          It now appears that Petitioner's amended federal habeas petition is now ripe for

17   adjudication.

18                    IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

19          An application for writ of habeas corpus by a person in custody under judgment of a state

20   court can only be granted for violations of the Constitution or laws of the United States.  See 28

21   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

22   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

23   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

24   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

25   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

26   decided on the merits in the state court proceedings unless the state court's adjudication of the

1  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

2  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

3  resulted in a decision that was based on an unreasonable determination of the facts in light of the

4  evidence presented in state court.  See 28 U.S.C. 2254(d).  Where a state court provides no

5  reasoning to support its conclusion, a federal habeas court independently reviews the record to

6  determine whether the state court was objectively unreasonable in its application of clearly

7  established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009); see also

8  Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000), overruled on other grounds, Lockyer v.

9  Andrande, 538 U.S. 63 (2003).

10         As a threshold matter, this Court must "first decide what constitutes 'clearly established

11  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

12  (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the

13  governing legal principle or principles set forth by the Supreme Court at the time the state court

14  renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a

15  federal habeas court making the unreasonable application inquiry should ask whether the state

16  court's application of clearly established federal law was "objectively unreasonable."  See

17  Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ

18  simply because the court concludes in its independent judgment that the relevant state court

19  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

20  application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding

21  on the states, Ninth Circuit precedent remains relevant persuasive authority in determining

22  whether a state court decision is an objectively unreasonable application of clearly established

23  federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the

24  Supreme Court's precedents are binding . . . and only those precedents need be reasonably

25  applied, we may look for guidance to circuit precedents.").

26         The first step in applying AEDPA's standards is to "identify the state court decision that

is appropriate for our review." See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The last

reasoned decision with respect to Claims II and III came from the California Court of Appeal on

direct appeal.  With respect to a portion of Claim I, Petitioner raised a portion of this Claim in

her state habeas petition to the California Supreme Court.  That court denied the state habeas

petition.

V.  ANALYSIS OF PETITIONER'S CLAIMS

A.  Claim I

In light of Petitioner's statement dated February 22, 2011, it appears as if Petitioner still

relies on the following facts to support her ineffective assistance of counsel arguments that trial

counsel failed to thoroughly investigate and evaluate available evidence of Petitioner's psychosis:

> (A) Trial counsel failed to thoroughly review approximately 27
> home made video tapes, recorded by petitioner in the weeks after
> Chances death, in which she purportedly captured the harassment
> from her next door neighbors prior to the shooting.  Alternatively,
> if he did review these videotapes, he failed to investigate what
> these tapes should have told him, research PTSD (post-traumatic
> stress disorder) to learn of the psychotic manifestations of that
> disorder, or consult an appropriate expert;
>
> (B) [P]etitioner had been treated at the Shasta County Mental
> Health Clinic in the years 1996-97.  Trial counsel failed to discover
> or investigate this prior mental health treatment for many of the
> same issues that worsened after her grandson's death;
>
> (C) From trial counsel's files, it would appear that he made no
> effort to contact or retain any expert witnesses other than those
> appointed by the court to access petitioner's sanity.  Petitioner
> alleges by information and belief that trial counsel should have
> contacted an independent defense expert on PTSD, especially after
> learning that the tapes did not record what petitioner claimed she
> had seen.

1   (Pet'r's Am. Pet. at p. 21, 24.)[3]

2       In her answer, Respondent argues that points (A) and (B) are barred by AEDPA's statute

3   of limitations because they do not relate back to the original federal habeas petition filed in

4   December 2008.  Additionally, Petitioner argues that points (A) and (B) are unexhausted.

5             i.  Statute of Limitations and Relation Back

6       The federal habeas corpus statute of limitations imposes a one-year statute of limitations.

7   See 28 U.S.C. § 2244(d)(1).  Typically, the one year period begins to run when the state court

8   judgment becomes final by the conclusion of direct review of the expiration of time for seeking

9   direct review.  Nonetheless, the statute of limitations is tolled while a properly filed state post-

10  conviction or other collateral review is pending.  See 28 U.S.C. 2244(d).

11      In this case, as previously noted, the California Supreme Court denied Petitioner's state

12  habeas petition on September 17, 2008.  Thus, she had one-year from that date to file her federal

13  habeas petition.  See id. § 2244(d)(2) ("The time during which a properly filed application for

14  State post-conviction or other collateral review with respect to the pertinent judgment or claim is

15  pending shall not be construed toward any period of limitation.").  Petitioner complied with

16  AEDPA's statute of limitations by filing her original federal habeas petition in December 2008.

17  The filing of this federal habeas petition did not toll AEDPA's one-year statute of limitations.

18  See Duncan v. Walker, 533 U.S. 167, 181 (2001) ("We hold that an application for federal

19  habeas review is not an 'application for State post-conviction or other collateral review' within

20  the meaning of 28 U.S.C. § 2244(d)(2).  Section 2244(d)(2) therefore did not toll the limitation

21  period during the pendency of respondent's first federal habeas petition.").  Thus, by the time

22  Petitioner filed her amended habeas petition on October 9, 2009, the statute of limitations period

23  had already expired a few weeks prior on September 18, 2009.

24      Even though the amended federal habeas petition was filed after AEDPA's statute of

25

26      [3] Pursuant to Petitioner's February 22, 2011 statement, her claims regarding the
toxicology tests and experts were withdrawn.

limitations expired, Petitioner argues that the factual allegations that remain within Claim I relate back to the original federal habeas petition.  Thus, she argues that these new factual allegations should not be barred by the application one-year statute of limitation period.

Under Federal Rule of Civil Procedure 15(a), a habeas petitioner may amend her pleadings once as a matter of course before a responsive pleading is served and may seek leave of court to amend her pleading at any time during the proceeding.  See Mayle v. Felix, 545 U.S. 644, 654-55 (2005).  Under Rule 15(c), a petitioner's amendments made after the statute of limitations has run will relate back to the date of the original pleading if the new claims arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.  See id. at 656 (citing Fed. R. Civ. P. 15(c)(2)).

In Mayle, the United States Supreme Court held that claims raised in an amended habeas corpus petition filed after expiration of the limitations period relate back to claims raised in a timely petition only if the claims "are tied to a common core of operative facts."  Id. at 664.  The fact that the claims arise from the same trial, conviction or sentence, without more, is insufficient to support the relation back of the claims.  See id.  New claims do not relate back if they depend upon events separate in both "time and type" from those set forth in the original pleading.  See id. at 650.  The common core of operative facts must not be viewed at too high a level of generality, and an "occurrence" will consist of each separate set of facts that supports a ground for relief.  See United States v. Ciampi, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 "relation back" standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney misfeasance.").  Applying these principles, the Supreme Court ruled in Mayle that the petitioner's new claim did not relate back to his original claim because the new claim arose from petitioner's own pretrial interrogation and was different in time and place from his original claim, which arose from the pretrial police interrogation of a witness.  See 545 U.S. at 659-60.

1  In a footnote, the Mayle Court cited two examples of relating back.  Id. at 664 n.7.  The

2  Supreme Court cited as an example of relation back where an original petition alleged violations

3  of Brady v. Maryland, 373 U.S. 83 (1963) and the amended petition raised the issue of the

4  government's failure to disclose a particular report.  See Mayle, 545 U.S. at 664 n.7.  A second

5  example of relation back that was given by the Court was where an original petition challenged

6  the trial court's admission of recanted statements and the amended petition challenged the trial

7  court's refusal to allow the defendant to show that the statements had been recanted.  Id.

8  An amended petition that expands upon or clarifies facts previously alleged may relate

9  back under this standard.  See United States v. Hicks, 283 F.3d 380, 388 (D.C. Cir. 2002);

10  Woodward v. Williams, 263 F.3d 1135, 1142 (10th Cir. 2001).  Thus, it is important to compare

11  Petitioner's original habeas petition with her amended habeas petition.  After considering and

12  comparing the original habeas petition to the claims that remain within Claim I in the amended

13  habeas petition, it is determined that the claims remaining within Claim I of the amended habeas

14  petition relate back.  As previously stated, Petitioner's original habeas petition argued that her

15  trial counsel was ineffective for failing to retain an expert to assist with her trial in light of the

16  fact that her mental state was the central issue during the trial.  The amended federal habeas

17  petition merely expands on this purported failure by trial counsel to properly evaluate and

18  investigate Petitioner's mental state through an expert by the purported failure of trial counsel to

19  (A) investigate the videotapes and (B) investigate Petitioner's prior mental health treatment.

20  These arguments are tied to the common core of Petitioner's ineffective assistance of counsel

21  claim of her original federal habeas petition.  They relate to trial counsel's ineffectiveness

22  regarding establishing Petitioner's mental state during the commission of the crimes.

23  Accordingly, the arguments that remain within Claim I are not barred by the statute of limitations

24  and can be considered on the merits.

25  ii.  Merits

26  Before reaching the merits of Petitioner's ineffective assistance of counsel arguments in

15

1   Claim I, it is important to determine the relevant standard of review.  Respondent argues in her

2   answer that Petitioner's first two arguments within Claim I, (A) failure of trial counsel to

3   properly review the videotapes and (B) failure to investigate Petitioner's prior mental history, are

4   unexhausted.[4]

5       A petitioner satisfies the exhaustion requirement by providing the highest state court with

6   a full and fair opportunity to consider each claim before presenting it to the federal court.  See

7   Baldwin v. Reese, 541 U.S. 27, 29 (2004); Fields v. Washington, 401 F.3d 1018, 1020 (9th Cir.

8   2005).  Petitioner never raised arguments (A) and (B) to the California Supreme Court in her

9   state habeas petition.  Since Petitioner never allowed the California Supreme Court to analyze his

10  first two arguments within Claim I, her amended federal habeas petition is deemed unexhausted.

11  See 28 U.S.C. § 2254(b)(1).  However, unexhausted claims "may be denied on the merits,

12  notwithstanding the failure of the applicant to exhaust the remedies in the courts of the State."

13  Id. § 2254(b)(2).  A federal court considering a habeas corpus petition may deny an unexhausted

14  claim on the merits when it is perfectly clear that the claim is not "colorable."  See Cassett v.

15  Stewart, 406 F.3d 614, 624 (9th Cir. 2005) ("the principle of comity counsels in favor of a

16  standard that limits a federal court's ability to deny relief under § 2254(b)(2) to circumstances in

17  which it is perfectly clear that the petitioner has no hope of prevailing").  Thus, this standard will

18  be used in analyzing Petitioner's first two arguments within Claim I.

19      The Sixth Amendment guarantees effective assistance of counsel.  In Strickland v.

20  Washington, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

21  ineffective assistance of counsel.  First, the petitioner must show that considering all the

22

23      [4] Respondent does not argue that Petitioner's argument that trial counsel was ineffective
    for failing to retain an expert as to Petitioner's mental state is unexhausted.  Thus, the applicable
24  standard for that argument is whether the California Supreme Court's decision resulted in a
    decision that was contrary to, or involved an unreasonable application of, clearly established
25  federal law, as determined by the Supreme Court of the United States; or (2) resulted in a
    decision that was based on an unreasonable determination of the facts in light of the evidence
26  presented in state court.  See 28 U.S.C. § 2254(d).

1  circumstances, counsel's performance fell below an objective standard of reasonableness.  See id.

2  at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

3  of reasonable professional judgment.  See id. at 690.  The federal court must then determine

4  whether in light of all the circumstances, the identified acts or omissions were outside the range

5  of professional competent assistance.  See id.

6        Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

7  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

8  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

9  probability sufficient to undermine the confidence in the outcome."  Id.  A reviewing court "need

10  not determine whether counsel's performance was deficient before examining the prejudice

11  suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

12  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

13  followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

14  597).

15        In this case, it is easier to dispose of Petitioner's ineffective assistance of counsel claims

16  under the prejudice prong.  Petitioner has come forward with no evidence that indicates that had

17  trial counsel either:  (1) viewed the videotapes thoroughly; (2) reviewed Petitioner's prior mental

18  health treatment; or (3) retained an expert to assist trial counsel with the guilty and sanity trials,

19  that the outcome of the proceedings would have been different to a reasonable probability.

20  Petitioner admits in her February 22, 2011 statement that:

21         Counsel has been unable to discover additional evidence in support
            of the prejudice prong in Claim I – Petitioner was deprived of her
22         Sixth Amendment right to effective assistance of counsel at trial
            who failed to thoroughly investigate and evaluate available
23         evidence of Ms. Morrison's psychosis.  [¶]  Although the
            underlying facts pled initially to support this claim remain as pled,
24         counsel with funding from this court was able to investigate the
            effect of these errors on the testimony of the expert witnesses at
25         trial.  After review of the newly discovered evidence by current
            counsel, each of these experts made the determination that it would
26         not have fundamentally altered their testimony at trial.  Without a

17

> reasonable probability of a better result at trial, petitioner cannot
> prove she was prejudiced by trial counsel's errors.

(Dkt. No. 44 at p. 3.)  Petitioner has not shown any evidence to indicate that she suffered

prejudice as a result of trial counsel's purported errors as stated in her amended habeas petition

(and narrowed via the February 22, 2011 statement).  She is not entitled to federal habeas relief

with respect to her (A) and (B) arguments within Claim I as they are not "colorable."

Additionally, Petitioner has not shown that the state court's rejection of her argument that

counsel was ineffective for failing to retain an expert at trial was an objectively unreasonable

application of clearly established federal law as she has not established prejudice as well for the

reasons stated above.  Therefore, Petitioner is not entitled to federal habeas relief on any of her

arguments within Claim I.[5]

    B.  Claim II

        In Claim II, Petitioner asserts that the prosecutor committed misconduct by improperly

questioning witnesses during trial as to the ultimate question of Petitioner's state of mind at the

time of the shooting.  Once again, Respondent argues that Claim II is barred by AEDPA's one-

year statute of limitations as it was filed more than one-year after the California Supreme Court's

denial of Petitioner's state habeas petition.  Alternatively, Respondent argues that the Claim lacks

merit.  In her traverse, Petitioner concedes that Claim II does not relate back to the original

December 2008 federal habeas petition.  However, she argues that she should be entitled to

equitable tolling thereby making Claim II timely.  As the statute of limitations is a threshold

issue, the statute of limitations will be analyzed before reaching the merits of this Claim.  See

---

[5] In her amended federal habeas petition and her February 22, 2011 "statement,"
Petitioner appears to assert an argument that trial counsel was also ineffective when he "failed to
make the proper objections to preserve petitioner's rights."  (Pet'r's Am. Pet. at p. 24 & Dkt. No.
44 at p. 3.)  However, Petitioner does not allude to any particular objections within her
discussion of Claim I that trial counsel should have made.  Therefore, this argument does not
warrant federal habeas relief as well.  See, e.g., James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)
("Conclusory allegations which are not supported by a statement of specific facts do not warrant
habeas relief.").

1  White v. Klitzkie, 281 F.3d 920, 921-22 (9th Cir. 2002) (stating that the statute of limitations is a

2  "threshold" issue in habeas proceedings).

3                       i.  Equitable Tolling

4        The limitations period may be equitably tolled where a habeas petitioner establishes two

5  elements:  (1) that she has been pursuing his rights diligently, and (2) that some extraordinary

6  circumstance stood in her way.  See Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).  The Ninth

7  Circuit has reiterated that the threshold necessary to trigger equitable tolling is very high, and

8  clarified that equitable tolling only applies where a petitioner shows that despite diligently

9  pursuing his rights, some external force caused the untimeliness.  See Waldron-Ramsey v.

10  Pacholke, 556 F.3d 1008, 1011 (9th Cir. 2009).  Petitioner has the burden of showing facts

11  entitling her to equitable tolling.  See Miranda v. Castro, 292 F.3d 1063, 1065 (9th Cir. 2002).

12        Petitioner argues that there were extraordinary circumstances which warrant equitably

13  tolling the statute of limitations.  She specifically mentions Petitioner's mental illness, trial

14  counsel's death and habeas counsel's lack of access to the relevant file and voluminous

15  documents until January 30, 2009.  Petitioner (via her habeas counsel) argues that trial counsel

16  died some time prior to her being appointed in January 2009.  Habeas counsel claims that she did

17  not ignore this case from January 30, 2009 until October 9, 2009.  She states that she needed

18  those nine months before she filed the amended federal habeas petition.  A review of the docket

19  in this case confirms that habeas counsel did not ignore this case, but was thoroughly

20  investigating possible claims that Petitioner might have.  Accordingly, she filed motions for

21  extension of time to file an amended habeas petition in August 2009 and again in September

22  2009, both of which were granted by Magistrate Judge Hollows.  Each of habeas counsel's

23  reasons why equitable tolling should apply will be considered in turn.

24                 a.  Petitioner's Mental Illness

25        Petitioner's habeas counsel alludes to Petitioner's mental illness as a possible rationale to

26  apply equitable tolling.  In Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010), the Ninth

1  Circuit enunciated the applicable test to determine the eligibility for equitable tolling based on

2  mental impairment.  The test requires the petitioner to meet a two-part test:

> (1)  First, a petitioner must show that his mental impairment was
> an "extraordinary circumstance" beyond his control by
> demonstrating the impairment was so severe that either
>     (a)  petitioner was unable rationally or factually to
>     personally understand the need to timely file; or
>     (b)  petitioner's mental state rendered him unable
>     personally to prepare a habeas petition and
>     effectuate its filing.
> (2)  Second, the petitioner must show diligence in pursuing the
> claims to the extent he could understand them, but that the mental
> impairment made it impossible to meet the filing deadline under
> the totality of the circumstances, including reasonably available
> access to assistance.

10  Id.  Petitioner's alleged mental illness as espoused by her habeas counsel does not warrant

11  equitably tolling the statute of limitations under these circumstances.  Petitioner was able to

12  timely file a federal habeas petition as illustrated by the December 2008 petition.  There is no

13  indication that Petitioner's mental illness prevented an amended habeas petition from being filed

14  on or before September 17, 2008, or seven and one-half months after habeas counsel was

15  appointed.

16                          b.  Trial Counsel's Death

17          Next, habeas counsel alludes to trial counsel's death before she was appointed as reason

18  to equitably toll the statute of limitations.  However, habeas counsel admits that she received the

19  file and relevant documents on January 30, 2009.  Trial counsel's death does not constitute an

20  extraordinary circumstance requiring equitably tolling the statute of limitations.

21                      c.  Voluminous Record and Investigation

22          Finally, Petitioner alludes to the fact of the voluminous record in this case and the fact

23  that she did not receive the relevant documents until January 30, 2009 as a reason for equitably

24  tolling the statute of limitations.  Petitioner needed to file an amended habeas petition on or

25  before September 17, 2008 in the event that any claims did not relate back to the original habeas

26  petition.  While the fact that Petitioner was represented by counsel for a sizable portion of the

applicable one-year statute of limitations period (approximately eight months) does not preclude equitable tolling, it certainly plays a role in determining whether Petitioner has demonstrated the existence of extraordinary circumstances justifying such tolling.  See Korolev v. Kirkland, Civ. No. 05-4992, 2008 WL 2037676, at *4 (N.D. Cal. May 12, 2008) ("Although proceeding with the assistance of counsel does not preclude a petitioner's reliance on the doctrine of equitable tolling, such petitioner is required to allege the existence of some 'extraordinary circumstance' that prohibited counsel from timely filing the petition."), aff'd by, Korolev v. Horel, 386 Fed. Appx. 594 (9th Cir. 2010), cert. denied, Korolev v. Dickinson, 131 S.Ct. 1008 (2011).  Thus, the relevant question is whether extraordinary circumstances prevented counsel from filing a timely amended habeas petition to include Claim II.  As previously stated, Petitioner bears this burden.  She has failed to meet that burden.

While it is understood that Petitioner's counsel needed time to review the relevant documents, she had over seven months in which to file an amended habeas petition after she received the file in this case.  Even though the file is voluminous, that does not mean Petitioner is entitled to equitable tolling.  See Bohoda v. Jackson, Civ. No. 05-74228, 2009 WL 982201, at *8 (E.D. Mich. Apr. 13, 2009) (noting that petitioner was represented by counsel at every critical stage of the proceedings and finding that counsel's necessarily time-consuming preparation of habeas pleadings and review of voluminous documents and complex record in drafting that petition failed to entitled petitioner to equitable tolling).  Here, nothing prevented Petitioner from filing an amended habeas petition prior to the expiration of the statute of limitations and then supplementing it with facts she discovered during the course of her investigation.  This point is particularly relevant under these circumstances because Claim II (as well as Claim III) was not a new claim.  Claim II (along with Claim III) was raised by Petitioner on direct appeal.  Having failed to file her amended habeas petition on or before September 17, 2009, and because equitable tolling does not apply, Claim II is barred by AEDPA's one-year statute of limitations.

//

ii.  Merits

While Claim II appears to be untimely, for purpose of completeness, the merits of Claim II will also be analyzed.

The California Court of Appeal, Third Appellate District was the last court to issue a reasoned decision on this Claim on direct appeal.  It stated the following[6]:

> Defendant's expert testified on cross-examination that defendant's actions were premeditated and intentional.  Such testimony is a violation of Penal Code section 29, which states:
>
>> "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged.  The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."
>
> Defendant claims it was . . . prosecutorial misconduct in eliciting the testimony from the expert . . . .  We shall conclude there was no misconduct[.]
>
> Defendant presented the testimony of Dr. Ray Carlson, a psychologist who performed a court-ordered evaluation on defendant with respect to her sanity at the time of the offenses.  On direct examination, Dr. Carlson opined that defendant was suffering from a major depressive disorder that colored her perceptions of reality, and that because of this disorder she was more susceptible to stress and had fewer resources for coping with life's reverses.
>
> On cross-examination, the prosecutor asked Dr. Carlson whether the fact that someone would go back inside, unload the gun, reload it, and come back out would indicate an action that was pre-thought out, assuming defendant fired the first six shots on sudden impulse.  Defense counsel objected, and an unreported bench conference was held.  After the bench conference, the prosecutor again asked:

---

[6] The California Court of Appeal also analyzed Petitioner's claim that it was trial court error to allow this testimony.  Petitioner's amended federal habeas petition only raises this issue as one of prosecutorial misconduct, thus the inquiry is limited to that prosecutorial misconduct issue only.

"The fact that she fired six shots, then went back
into her apartment, went back to the kitchen, you
know, opened the cylinder, took out the empties,
took a box of bullets, took six out, reloaded the gun,
closed the cylinder, went back outside and fired
three more shots, would that be more indicative of
an act that was previously thought out, and
intentional as opposed to a spontaneous, provoked –
immediately provoked act?"

In response, Dr. Carlson said that he did not have an opinion on
whether the act was pre-thought out, but that such action,
"certainly bears out all the marks of being intentional."

The prosecutor asked Dr. Carlson if he thought that the title of the
videotape defendant filmed both before and after the shooting, "My
Neighbor's Fate," indicated the act was preconceived.  Dr. Carlson
answered, "[i]t certainly makes me wonder, yeah."  The prosecutor
then asked whether the statement defendant made on the videotape
to the effect of, "This is the day," would lead Dr. Carlson to
believe that the act of shooting was pre-thought out.  Dr. Carlson
replied, "Yes, I think I mentioned that somewhere in my report."

Later, the prosecutor asked whether other statements made on the
videotape, specifically, "If I had time, I'd go kill all the fucking
parents who raised these awful, awful people.  They need to be
dead" and "[t]heir offspring need to be dead," indicated a pre-
thought intent to kill.  Dr. Carlson replied the statements indicated,
if not an intent to kill, a desire to have the people dead.

The prosecutor asked Dr. Carlson whether defendant's videotaped
message made before the shooting, in which she said, "and when I
shoot her, I'm going . . to put a bottle of aspirin in her fucking
mouth so her daddy will see," was consistent with premeditation
and intent to shoot somebody.  Dr. Carlson replied he thought it
was.

The prosecutor asked about certain statements in Dr. Carlson's
report where he indicated the victims appeared to have been
intentional targets and that the behavior was not random, but
"focused and effectual."  The prosecutor asked whether this was
another way of saying defendant had a pre-conceived motivation.
Dr. Carlson answered that he did not mean to say that her actions
were pre-conceived, but that they were intentional as opposed to
accidental behavior.  He then stated:

"a little while ago you asked me some questions
about what I thought in terms of her intent, and
whether she had some thoughts beforehand about
what she was going to do on that day.  And I think I
answered in the affirmative several times, that I – in

23

my own mind, I felt that there was some evidence
and in statement that she made that she had thought
about doing what she had done beforehand.  And it
was not a completely spontaneous thing.  I was
simply saying here, in response to your question,
that the things you are reading off here, I wasn't
meaning to talk about premeditation, mainly about
the intentional aspect of it.  You know, you can drop
a gun accidentally.  You can hit its trigger and it
will go off accidentally.  You can kill someone
doing that.  That would not be intentional."

Finally, the prosecutor asked whether it was Dr. Carlson's opinion
that the shooting was premeditated.  Dr. Carlson answered, "In
accordance with the other questions you asked me and with the
statements that she made and the things that you had – reviewed
previously, yes."

On cross-examination, Dr. Carlson was asked whether defendant's
statements prior to the shootings could also be depicted as
someone merely venting.  Dr. Carlson replied that they could.
After Dr. Carlson's testimony and in a reported conference outside
the jury's presence, defense counsel stated he had objected to
allowing the doctor to testify to defendant's state of mind at the
time the events occurred, and had been overruled by the court.  The
trial court responded it had allowed the testimony on the basis of
Penal Code section 28, which allows evidence of mental disease,
defect, or disorder solely on the issue of whether or not the accused
actually formed a required specific intent or premeditation.

The next day defense counsel made a motion for a mistrial based
upon prosecutor misconduct and the court's ruling allowing Dr.
Carlson to testify to the ultimate issue of fact, i.e., the defendant's
state of mind at the time the act was committed.  The prosecutor
responded that defendant had put Dr. Carlson on the witness stand
to elicit testimony that the crime had been spontaneous and that
defendant was suffering from a mental condition.  He argued he
had a right on cross-examination to impeach that testimony and
elicit from the expert an opinion based on the facts of the crime
that the act was not caused by depression, but was caused by
hostility and hatred and a preconceived intent to achieve justice.

The trial court proposed giving a curative instruction, citing the
specific language of Penal Code section 29, and telling the jury to
disregard the expert's testimony as it related to the defendant's
intent.  The defense attorney argued that a curative instruction
would not prevent the jurors from considering the testimony it
heard.  The court agreed with defense counsel that the testimony
should not have been admitted and determined the error could be
cured by a curative instruction.

The prosecutor told the court that he had no intention of violating the court's order that he had not intentionally elicited improper testimony the day before. "I asked those questions after we had a bench conference. I don't intend to do it today." The prosecutor informed the court he had reviewed his anticipated questioning of the next expert witnesses and had changed and omitted questions he thought might be in violation of Penal Code sections 28 and 29. The court responded, "Just to make the record clear, the Court doesn't find anything anywhere close to prosecutorial misconduct. The three of us had a very deep, intellectual discussion about this issue to some extent yesterday. And, you know, reasonable minds can differ. And I think that the resolution of this issue today is much better reasoned, having gone into great detail with the Smith[e]y [FN 4] case."

[FN 4]  People v. Smithey (1999) 20 Cal.4th 936.

Thereafter, the court gave the following curative instruction:

> "Yesterday, you heard testimony from Dr. Ray Carlson. Among other issues, he testified as to the intent or lack of intent on the part of the Defendant when she engaged in certain acts. When I use the term "intent," I would include his comments he made as to premeditation or the lack of premeditation.
>
> After conferring with counsel and doing some more research on that issue, the jury is to disregard that portion of Dr. Carlson's testimony where he discussed intent or lack of intent, or premeditation or lack of premeditation on the part of the Defendant when she engaged in certain acts. And when I say you are to disregard that testimony, what I mean by that is, you are to treat that testimony as though you had never heard it. As though that testimony had never occurred in this case.
>
> The Court is giving you this instruction after having conferred with both counsel and discussed this in great detail and done some additional research on the issue. And let me explain one reason why the Court is giving you that instruction.
>
> Specifically, there is a Penal Code statute which is one of several bases why the court is – is giving you that instruction. I'm going to read that Penal Code statute to you in its entirety, because it might help you understand why the Court is making this decision.
> [Penal Code section 29 was recited to the jury.]

1
2
3
      That's your job to decide what the Defendant's mental state was at the time she allegedly engaged in any sort of acts.  So, that's why the Court is excluding that testimony.

4
5
6
7
8
      Now, you have received some testimony from Dr. Carlson and you will continue to receive some testimony from other experts in this case as to the mental – as to mental disease, mental defect or mental disorders.  That may be some of the testimony you'll continue to hear in this case.  You may find that testimony helpful in determining whether or not a mental disease, mental defect or mental disorder exists or existed at certain moments in time with respect to the Defendant.

9
10
11
12
13
14
      However, whether or not those defects, disorders or diseases affected the Defendant's state of mind at the time she engaged or did not engage in certain alleged acts, that's your decision to make in this case.  You will – as I've continued to comment throughout this case, you will also receive, after both sides have rested, some more specific instructions from the Court as to the – some of the expert witness testimony and evidence presented in this case.  So, you'll get some more instructions about that later on, after both parties have rested."

15
16
17
18
Subsequently, defendant called Dr. David Wilson, a court-appointed psychologist, who diagnosed defendant as suffering from post traumatic stress disorder, PTSD.  On cross-examination, the prosecutor confirmed with Dr. Wilson that he had stated on direct that PTSD could cause someone to react without thinking.  Then the following exchange took place:

19
20
21
22
      "[Prosecutor]:  Okay.  If you were investigating a murder that occurred, and that person who committed the murder made statements weeks prior to the murder having to do with intent to commit the murder, would that affect your opinion as to whether or not that murder was done because of PTSD and spontaneous action?

23
24
      [Wilson]:  That would argue against that being like a flash back or sudden reliving, as if you were in another place and time.

25
26
      [Prosecutor]:  Okay.  Let me give you another hypothetical example.  If you had a case where someone suffered a loss and rightly or wrongly, attributed that loss to somebody else.  And several

weeks prior to the shooting, documented her
feelings of hatred towards these people, and went
out and bought the instrument that was going to be
used during the crime and . . . for example, a gun.
And then a week after that, went out and bought
bullets, and then made a video about what she was
going to do, and then went out and did what she
said she was going to do, would your opinion be
that that crime was committed --"

Dr. Wilson gave no answer to this question because defense
counsel objected.

A.  Prosecutorial Misconduct

A prosecutor's behavior violates the federal Constitution only if
there was a pattern of conduct by the prosecutor that was so
egregious that it rendered the trial unfair and made conviction a
denial of due process.  (People v. Samayoa (1997) 15 Cal.4th 795,
841.)  Under California law, a prosecutor's conduct does not render
the trial fundamentally unfair unless the prosecutor's methods of
persuading the court or jury were deceptive or reprehensible.
(Ibid.)

We agree with the trial court that some of the prosecutor's
questions were improper inasmuch as they attempted to elicit Dr.
Carlson's expert opinion on whether defendant acted intentionally
or with premeditation.  On the other hand, a prosecutor may
attempt to show intent by focusing on a defendant's acts and asking
how a defendant could perform such acts without intending to do
them.  (People v. Smithey, supra, 20 Cal.4th at p. 961.)  The line
between a proper and an improper question in this area is easily
blurred.  Here, while some of the prosecutor's questions appear to
have crossed the line, most did not.

In any event, the improper questions do not amount to an egregious
pattern of conduct, nor did they render the trial fundamentally
unfair.  Only a few of the questions were improper.  There were
three conferences between the parties and the trial court over the
propriety of the questions, and only after the last one did the trial
court decide the evidence was not admissible.  Thus, the conduct
was not egregious, it did not constitute a pattern, and it was
insufficient to render the trial fundamentally unfair.

(Slip Op. at p. 23-32.)

The California Court of Appeal also analyzed whether any purported error was harmless.

The California Court of Appeal stated that any error:

is not reversible unless "it is reasonable probable that a result more

27

1    favorable to the appealing party would have been reached in the
     absence of the error."  (People v. Watson (1956) 46 Cal.2d 818,
2    836; see also People v. Davis (2005) 36 Cal.4th 510, 532 [error
     under Penal Code sections 977 and 1043 is state law error subject
3    to People v. Watson, supra].)  The overwhelming amount of
     evidence in this case regarding premeditation and the intentional
4    nature of defendant's actions convinces us that it is not reasonably
     probable that a result more favorable to defendant would have
5    resulted in the absence of the error.

6    First, the videotape entitled, "My Neighbor's Fate," which was
     apparently made just before and after the shooting, shows
7    defendant brandishing a gun and, referring to her neighbors,
     stating, "Wait'll they get a load of this.  Or get a few loads of it.
8    I'm waiting on em' to come home."  She also says, apparently
     referring to Coccellato, "I want to shoot her with the bottle of
9    aspirin in her fucking mouth, so her Daddy will see . . . ."

10   Also, in a letter found in defendant's apartment dated October 21,
     2003 (approximately two weeks before the shootings), defendant
11   wrote, "I would like to request that my grave not be marked for at
     least a period of two years allowing time for friends of those killed
12   to pass and therefore lessening chances of any grave desecration."
     On another letter, written the same day, she wrote, "I would rather
13   be dead than to let them live."

14   Prior to the shooting, defendant obtained a gun, and one week
     before the shooting she purchased ammunition.
15
     During the shootings, defendant fired multiple shots at the victims,
16   and at one point went back inside her apartment to reload her gun.
     After the shooting, defendant told her apartment manager, "I told
17   you if you didn't take care of this, I was going to shoot the little
     motherfuckers."
18
     Thus, defendant's words and actions provide abundant evidence of
19   intent and premeditation.  Additionally, the court's curative
     instruction was thorough, and explained to the jury both the
20   statutory reason it was not to consider the expert's statements
     regarding intent and premeditation, as well ast eh fact that the jury
21   itself was responsible for determining such factual matters.  We
     assume the jury abided by the court's instructions, avoiding any
22   prejudice.  (People v. Stitely (2005) 35 Cal.4th 514, 559.)  It is not
     reasonably likely the jury would have found she acted without the
23   intent to kill or without premeditation absent the error.

24   (Slip Op. at p. 32-33.)

25          A criminal defendant's due process rights are violated if prosecutorial misconduct renders

26   a trial "fundamentally unfair."  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing

                                              28

1  <u>Darden v. Wainright</u>, 477 U.S. 168, 183 (1986)).  A habeas petition will be granted for

2  prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to

3  make the resulting conviction a denial of due process."  <u>Darden</u>, 477 U.S. at 181 (internal

4  quotation marks and citation omitted).  A determination that the prosecutor's questioning was

5  improper is insufficient in and of itself to warrant reversal.  <u>See</u> <u>Ortiz v. Stewart</u>, 149 F.3d 923,

6  934 (9th Cir. 1998).  Further, isolated comments by a prosecutor may be cured by jury

7  instructions.  <u>See</u> <u>Sassounian v. Roe</u>, 230 F.3d 1097, 1106-07 (9th Cir. 2000); <u>see</u> <u>also</u> <u>Hall v.</u>

8  <u>Whitley</u>, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were

9  isolated moments in a three day trial.")  A claim of prosecutorial misconduct is analyzed under

10  the prejudice standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).  <u>See</u> <u>Karis v.</u>

11  <u>Calderon</u>, 283 F.3d 1117, 1128 (stating that a claim of prosecutorial misconduct is analyzed

12  under the standard set forth in <u>Brecht</u>).  Specifically, the inquiry is whether the prosecutorial

13  misconduct had a substantial and injurious effect on the jury's verdict.  <u>See</u> <u>Johnson v. Sublett</u>,

14  63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial misconduct because it

15  could not have had a substantial impact on the verdict under <u>Brecht</u>).

16       A challenged or offering statement must also be evaluated in the context of the entire

17  trial, as well as the context in which it was made.  <u>See</u> <u>Boyde v. California</u>, 494 U.S. 370, 384-85

18  (1990).  Some factors to consider in determining the prejudice effect of a prosecutor's

19  misconduct include:  (1) whether a curative instruction was issued, <u>see</u> <u>Greer v. Miller</u>, 483 U.S.

20  756, 766 n.8 (1987); (2) the weight of evidence of guilt, <u>compare</u> <u>United States v. Young</u>, 470

21  U.S. 1, 19 (1985) (finding "overwhelming evidence" of guilt), <u>with</u> <u>United States v. Schuler</u>, 813

22  F.2d 978, 982 (9th Cir. 1987) (requiring new trial after prosecutor referred to defendant's

23  courtroom demeanor, in light of prior hung jury and lack of curative instruction); (3) whether the

24  misconduct was isolated or part of an ongoing pattern, <u>see</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809

25  (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, <u>see</u> <u>Giglio v.</u>

26  <u>United States</u>, 405 U.S. 150, 154 (1972); and (5) whether the prosecutor's comment misstates or

1    manipulates the evidence.  See Darden, 477 U.S. at 181-82.

2         California Penal Code § 29 states that, "[i]n the guilt phase of a criminal action, any

3    expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not

4    testify as to whether the defendant had or did not have the required mental states, which include,

5    but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged.

6    The question as to whether the defendant had or did not have the required mental states shall be

7    decided by the trier of fact."

8         The prosecutor's actions during the guilt phase of the trial with respect to the cross-

9    examination of Dr. Carlson and Dr. Carlson's opinion with respect to whether Petitioner acted

10   intentionally or with premeditation do not warrant federal habeas relief.  Assuming *arguendo* that

11   it was in error for the prosecutor to ask these questions, it did not have a substantial and injurious

12   effect on the jury's verdict.  First, the trial court issued a curative instruction to the jury with

13   respect to the purported improper questioning by the prosecutor and Dr. Carlson's answer.  The

14   jury is presumed to have followed the trial court's instruction to disregard Dr. Carlson's

15   testimony on this matter.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Second, for the

16   reasons espoused by the California Court of Appeal, the weight of the evidence supporting a

17   premeditated and intentional theory in this case was strong.  It included the videotape created by

18   Petitioner before the shooting entitled, "My Neighbor's Fate," letters that Petitioner wrote before

19   the murder and Petitioner's retention of a gun and ammunition before the shooting amongst other

20   pieces of evidence.  Under these circumstances, Petitioner is not entitled to federal habeas relief

21   on the merits of this Claim as well.

22        Petitioner also argues that the prosecutor committed misconduct during the second sanity

23   trial.  In the amended federal habeas petition, Petitioner states that:

24            However, during the second sanity trial, the prosecutor asked the
              very same question of Dr. Wilson.  In referring to the letter written
25            by petitioner less than two weeks before the shooting, the
              prosecutor asked Dr. Wilson, "does that show that she had planned
26            or premeditated this crime" and Dr. Wilson replied that it did.  XII

                                          30

1   RT 3577.  Then he did the exact same thing with Dr. Carlson at the
    second sanity trial.  Reading again from Petitioner's letter in which
2   she asks that her grave not be marked for two years to allow time
    for the friends and family of those she killed to recover, the
3   prosecutor asked:  "Does that indicate a planned, premeditated act
    when the shooting actually occurred?"  XIII RT 3826.  Dr. Carlson
4   answered that in his opinion, it did.  XIII RT 3836.

5   (Pet'r's Am. Pet. at p. 38-39.)

6         Petitioner never raised this issue to the California Supreme Court.  In her petition for

7   review to the California Supreme Court, Petitioner only argued that the prosecutor committed

8   misconduct during the guilt trial phase.  (See Resp't's Lodged Doc. No. 5 at p. 16-19.)  A

9   petitioner satisfies the exhaustion requirement by providing the highest state court with a full and

10  fair opportunity to consider each claim before presenting it to the federal court.  See Baldwin,

11  541 U.S. at 29; Fields, 401 F.3d at 1020.  Since Petitioner never allowed the California Supreme

12  Court to analyze this argument, it is deemed unexhausted.  See 28 U.S.C. § 2254(b)(1).

13  However, unexhausted claims "may be denied on the merits, notwithstanding the failure of the

14  applicant to exhaust the remedies in the courts of the State."  Id. § 2254(b)(2).  A federal court

15  considering a habeas corpus petition may deny an unexhausted claim on the merits when it is

16  perfectly clear that the claim is not "colorable."  See Cassett, 406 F.3d at 624 ("the principle of

17  comity counsels in favor of a standard that limits a federal court's ability to deny relief under §

18  2254(b)(2) to circumstances in which it is perfectly clear that the petitioner has no hope of

19  prevailing").

20        Here, Petitioner's argument that the prosecutor committed misconduct in his questioning

21  of Dr. Wilson and Dr. Carlson during the second sanity trial is not "colorable."  As explicitly

22  stated in the statute, California Penal Code § 29 only applies in the guilt phase a criminal action,

23  whereas Petitioner's unexhausted argument here attributes the prosecutor's questions to the

24  experts during the sanity phase of the trial.  The jury had already determined in the guilt phase

25  that Petitioner had the requisite mental state to be convicted of the crimes for which she was

26  convicted.

                                          31

1    Petitioner appears to argue that had these questions not been asked of the experts during

2    the sanity trial, she would have been found not guilty by reason of insanity.  The particular

3    questions that Petitioner objects to in her amended habeas petition arising from the questioning

4    of Dr. Wilson and Dr. Carlson did not have a substantial and injurious effect on the jury's verdict

5    that Petitioner was sane.  For example, Dr. Wilson, a clinical psychologist who met with

6    Petitioner testified during sanity phase of the proceedings that, "[I]n [his] opinion, [Petitioner]

7    did not meet the legal test for insanity as suffering from a mental disorder that made her unable to

8    appreciate the nature and quality of her actions, or to understand the difference between right and

9    wrong." (Reporter's Tr. at p. 3571.)  Dr. Wilson was neither retained by the prosecution or the

10   defense but was appointed by the Superior Court as a result of Petitioner's not guilty plea by

11   reason of insanity.  Dr. Carlson also came to the same conclusion that Petitioner was sane.

12   (Reporter's Tr. at p. 3825.)  Another expert who interviewed Petitioner after the crimes also

13   testified that Petitioner was sane at the time of the crimes in his opinion.  (See Reporter's Tr. at

14   p. 3746.)  Thus, based on numerous experts testifying that Petitioner was sane, the case

15   supporting her sanity was strong.  Petitioner failed to show that there was a substantial or

16   injurious effect on the jury's verdict on the issue of sanity in light of the two purportedly

17   improper questions Petitioner argues the prosecutor asked these experts during the second sanity

18   proceeding.

19        For all of the foregoing reasons, Petitioner is not entitled to federal habeas relief on Claim

20   II.

21        C.  Claim III

22        In Claim III, Petitioner argues that she was denied due process of law and a fair trial when

23   the trial court used "a jury instruction that wrongly increased the burden of proof on Petitioner to

24   prove to a certainty that the circumstantial evidence would only support a finding of insanity."

25   (Pet'r's Am. Pet. at p. 41.)

26   //

i.  Statute of Limitations

Respondent argues that Claim III is also barred by the statute of limitations since it was not included in her original federal habeas petition and does not relate back to the original federal habeas petition.  Petitioner concedes that Claim III does not relate back to the originally filed federal habeas petition.  (See Pet'r's Traverse at p. 3.)  Similar to Claim II, Petitioner argues that equitable tolling should apply so that Claim III should be considered timely.  However, for the same reasons described in supra Part V.B.i, Petitioner is not entitled to equitable tolling.  Thus, Claim III is untimely and barred by AEDPA's one-year statute of limitations.

ii.  Merits

For purposes of completeness, even if Claim III was not barred by the statute of limitations, it would not entitle Petitioner to federal habeas relief on the merits.  The California Court of Appeal analyzed this Claim on direct appeal and stated the following:

> Penal Code section 1026, subdivision (a) provides that when a defendant pleads not guilty by reason of insanity and joins it with another plea, the defendant shall first be tried solely on the issue of guilt, with sanity being conclusively presumed.  If found guilty, the defendant is then tried on the issue of sanity.  The defendant has the burden of proving insanity by a preponderance of the evidence.  (Pen. Code, § 25.)

> At defendant's second sanity trial, [FN 8] the court gave an instruction regarding circumstantial evidence that defendant argues was in error because it unfairly increased her burden of proving insanity.  We agree that the trial court erred in giving the instruction, but shall conclude the error was harmless because it is not reasonably probable the result would have been more favorable to defendant in the absence of the error.
> [FN 8] The first sanity trial resulted in a hung jury.

> The instruction to which defendant objects was a modified version of CALJIC No. 2.01, properly given when the prosecution substantially relies on circumstantial evidence for proof of guilt.  (People v. Wiley (1976) 18 Cal.3d 162, 174-175.)  The modified version given by the trial court instructed as follows:

> > "A finding of insanity may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the Defendant is insane at the time of the

33

> commission of the crimes, but two, cannot be
> reconciled with any other rational conclusion.
>
> Further, each fact which is essential to complete a
> set of circumstances necessary to establish the
> Defendant's insane must be proved by a
> preponderance of the evidence.  In other words,
> before an inference essential to establish insanity
> may be found to be proved by a preponderance of
> the evidence, each fact or circumstance on which
> the inference necessarily rests must be proved by a
> preponderance of the evidence.
>
> Also, if the circumstantial evidence as to any
> particular count permits two reasonable
> interpretations, one of which points to the
> Defendant's insanity and the other to her sanity, you
> must adopt that interpretation that points to the
> Defendant's sanity and reject that interpretation that
> points to her insanity.
>
> If, on the other hand, one interpretation of this
> evidence appears to you to be reasonable and the
> other interpretation to be unreasonable, you must
> accept the reasonable interpretation and reject the
> unreasonable."

This instruction, when given during the guilty phase of the trial, is
another way of stating the presumption of innocence and
reasonable doubt standards.  (People v. Heuss (1928) 95 Cal.App.
680, 682.)  By contrast, no such instruction is appropriate in a civil
case because a party relying on circumstantial evidence is not
required to exclude all other possibilities.  (Rodela v. Southern
California Edison Co. (1957) 148 Cal.App.2d 708, 714.)  In civil
cases, a fact is sufficiently established by circumstantial evidence if
the inference sought to be drawn is more probable than not,
whereas in criminal cases the evidence is sufficient only if it is the
only conclusion that can fairly and reasonably be drawn.  (Meier v.
Northern Pac. Ry. Co. (1908) 51 Or. 69, 74-75, cited with approval
in Ley v. Bishopp (1928) 88 Cal.App. 313, 316.)

Because the defendant has the burden of proving insanity by a
preponderance of the evidence, the burden of proof was the same
as the civil standard, and we conclude it was in error to give the
instruction.  Likewise, it has been held to be error to give the
instruction in a competency proceeding.  (People v. Johnwell
(2004) 121 Cal.App.4th 1267, 1274.)  Competency proceedings,
like sanity trials, require the defendant to prove incompetence by a
preponderance of the evidence.  (Id. at p. 1273.)  The modified
version of CALJIC No. 2.01 places on the defendant the "burden of
disproving every rational conclusion and reasonable interpretation

34

of the evidence" except that which points to incompetence or insanity.  (<u>Id.</u> at p. 1274.)  This burden is higher than the preponderance of the evidence standard.  (<u>Ibid.</u>)

Defendant argues the error was structural error entitled to per se reversal, or alternatively that it was fundamental error that was not harmless beyond a reasonable doubt.  We disagree.

"[C]ertain fundamental errors in procedure, sometimes referred to as "'structural,'" 'are not susceptible to "ordinary" or "generally applicable" harmless error analysis – i.e., the <u>Watson</u> "reasonably probable" standard – and may require reversal of the judgment notwithstanding the strength of the evidence contained in the record in a particular case.'" (<u>People v. Vasquez</u> (2006) 39 Cal.4th 47, 66, quoting <u>People v. Cahill</u> (1993) 5 Cal.4th 478 at p. 493.) However, the defendant's burden of proof in a sanity trial is not mandated by the federal Constitution or by due process.  (<u>Leland v. State of Or.</u> (1952) 343 U.S. 790, 798-799 [96 L.Ed. 1302, 1309.) Moreover, the United States Supreme Court has upheld a state law requiring a defendant to prove insanity beyond a reasonable doubt. (<u>Ibid.</u>)  Thus, assuming the jury understood the instruction to require proof of insanity beyond a reasonable doubt, it would not "'offend [] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  (<u>Ibid.</u>) Accordingly, the error in giving the instruction was neither structural nor fundamental.

Instead, the preponderance of the evidence standard in a sanity trial is a matter of state law, mandated in California by statute.  (<u>Clark v. Arizona</u> (2006) – U.S. – [126 S.Ct. 2709, 2722, 165 L.Ed.2d 842, 862].)  Prejudice from a state law error is evaluated under the standard of <u>People v. Watson</u>, supra 46 Cal.2d 818.  (<u>People v. Vasquez</u>, <u>supra</u>, 39 Cal.4th at p. 66.)  Pursuant to this standard we will reverse on appeal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (<u>Watson</u>, <u>supra</u>, at p. 836.)

Considering the evidence presented at defendant's sanity trial, it is not reasonably probable that a result more favorable to her would have been reached had the jury not received the circumstantial evidence instruction.  The most damaging evidence in support of the verdict that defendant was sane at the time of the shootings was not circumstantial evidence at all, but was the direct evidence presented by the testimony of the court appointed psychologists. All three of them testified that in their expert opinion, defendant was sane at the time of the shootings.  Additionally, another psychologist who evaluated defendant the day after the shootings testified that in his opinion, defendant was not insane when she committed the crimes.

Other circumstantial evidence was presented from which no

1
2
3
4
5
6

reasonable inference of insanity could be drawn.  Defendant's physician, who saw her just a week before the shooting, testified defendant did not exhibit any psychotic behavior during her visit. Niver testified that during his interrogation of defendant, she said she knew what she had done was wrong and that if she could, she would take it all back.  He also testified she did not appear to be out of touch with reality.  Finally, the videotape, "My Neighbor's Fate" and the videotaped police interrogation portray a defendant who was in touch with reality, was capable of knowing and understanding the quality of her actions, and was capable of distinguishing between right and wrong.

7
8
9
10
11

In contrast to the overwhelming direct and circumstantial evidence of defendant's sanity, she presented the testimony of certain friends and family members who testified to defendant's actions prior to the shootings, and testified that they "thought she was becoming insane," was losing her mind, or "was mentally unstable."  Given the state of the evidence on the issue of sanity, it is not reasonably probable that defendant would have obtained a more favorable outcome absent the erroneous instruction.

12  (Slip Op. at p. 43-48.)

13        A challenge to a jury instruction solely as an error of state law does not state a claim

14  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

15  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

16  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

17  process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

18  must be considered in the context of the instructions as a whole and the trial record.  See id.  The

19  court must evaluate jury instructions in the context of the overall charge to the jury as a

20  component of the entire trial process.  See United States v. Frady, 456 U.S 152, 169 (1982).

21  Furthermore, even if it is determined that the instruction violated the petitioner's right to due

22  process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

23  influence on the conviction and thereby resulted in actual prejudice under Brecht, 507 U.S. at

24  637, which is whether the error had substantial and injurious effect or influence in determining

25  the jury's verdict.

26        In her amended habeas petition, Petitioner argues that the Brecht standard should not

apply under these circumstances "[g]iven that the sanity trial was conducted according to an

erroneous burden of proof greatly favoring the prosecution." (Pet'r's Am. Pet. at p. 42.)  Thus,

Petitioner argues that the purported error amounted to structural error warranting reversal.

Petitioner relies on Sullivan v. Louisiana, 508 U.S. 275 (1992) in arguing that any purported

error was structural error which requires reversal.  In Sullivan, the Supreme Court noted that

harmless error analysis did not apply where the trial court gave a defective reasonable doubt

standard.  See 508 U.S. at 278-79.  The Court noted that the proof beyond a reasonable doubt

standard was founded in the Constitution.  See id. at 278 ("It is self-evident, we think, that the

Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment

requirement of a jury verdict are interrelated.").

However, as noted by the California Court of Appeal as well as Respondent in her

answer, Petitioner's burden of proof in a sanity trial is not mandated by the Federal Constitution

or due process.  See Leland v. State of Or., 343 U.S. 790, 798-99 (1952).  In Leland, the Supreme

Court noted that Oregon was the only state to require the accused to establish the defense of

insanity beyond a reasonable doubt.  See id. at 798.  The court stated that:

> Some twenty states, however place the burden on the accused to
> establish his insanity by a preponderance or some similar measure
> of persuasion.  While there is an evident distinction between these
> two rules as to the quantum of proof required, we see no practical
> difference of such magnitude as to be significant in determining the
> constitutional question we face here.  Oregon merely requires a
> heavier burden of proof.  In each instance, in order to establish
> insanity as a complete defense to the charges preferred, the accused
> must prove that insanity.  The fact that a practice is followed by a
> large number of states is not conclusive in a decision as to whether
> that practice accords with due process, but it is plainly worth
> considering in determining whether the practice offends some
> principle of justice so rooted in the traditions and conscience of our
> people as to be ranked as fundamental.
>
> Nor is this a case in which it is sought to enforce against the states
> a right which we have held to be secured to defendants in federal
> courts by the Bill of Rights.  In Davis v. United States, supra, we
> adopted a rule of procedure for federal courts which is contrary to
> that of Oregon.  But its procedure does not run afoul of the
> Fourteenth Amendment because another method may seem to our

> thinking to be fairer or wiser or to give a surer promise of
> protection to the prisoner at the bar.  The judicial judgment in
> applying the Due Process Clause must move within limits of
> accepted notions of justice and is not to be based upon the
> idiosyncracies of a merely personal judgment.  An important
> safeguard against such merely individual judgment is an alert
> deference to the judgment of the state court under review.  We are
> therefore reluctant to interfere with Oregon's determination of its
> policy with respect to the burden of proof on the issue of sanity
> since we cannot say that policy violates generally accepted
> concepts of basic standards of justice.

Id. at 798-99 (internal quotation marks and citations omitted).  Therefore, a defendant may,

consistent with due process, be required to prove his sanity beyond a reasonable doubt under the

Constitution.  See id.; see also United States v. Amos, 803 F.2d 419, 421 (8th Cir. 1986); United

States v. Kelly, 500 F.2d 72, 73-74 (7th Cir. 1974).  As the standard of proof of Petitioner's

sanity is not constitutionally mandated, any purported error on the jury instruction on the burden

of proof at Petitioner's mistrial is not a structural error, but one that is subject to harmless error

analysis.

Assuming *arguendo* that the trial court erred in its instructions to the jury during the

second sanity trial on the issue of the burden of proof required, it did not have a substantial and

injurious effect on the jury's verdict of finding Petitioner sane.  By way of example only, as

noted by the California Court of Appeal, the psychologists who testified during Petitioner's

sanity trial opined that she was sane in their expert opinion.  Thus, any purported error in the jury

instructions was harmless in light of the strong evidence supporting Petitioner's sanity.  The

California Court of Appeal's decision was not an unreasonable application of clearly established

law.  Even if the jury instruction was in error, the error was harmless.  For the foregoing reasons,

Petitioner is not entitled to federal habeas relief on Claim III.

VI.  CONCLUSION

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge

38

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within seven days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

elects to file, Petitioner may address whether a certificate of appealability should issue in the

event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

when it enters a final order adverse to the applicant).

DATED:  March 10, 2011


TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

39